IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MELISSA MCDONALD,

    Plaintiff,

v.

E.I. DUPONT DE NEMOURS AND
COMPANY TOTAL AND PERMANENT
DISABILITY PLAN,

    Defendant.

Civil Action No. 23-1141-RGA

MEMORANDUM OPINION

Marc H. Snyder, Christopher R. Harris, ROSEN MOSS SNYDER LLP, Wilmington, DE,

    Attorneys for Plaintiff.

Beth Moskow-Schnoll, Jason A. Leckerman, BALLARD SPAHR LLP, Wilmington DE,

    Attorneys for Defendant.

September 25, 2025

1

ANDREWS, U.S. DISTRICT JUDGE:

Before me are Plaintiff's Motion for Summary Judgment (D.I. 21) and Defendant's cross-motion for the same (D.I. 23). I have considered the parties' briefing. (D.I. 22, 24, 30, 31, 32, 33). For the reasons that follow, Plaintiff's motion is DENIED and Defendant's motion is GRANTED.

I. BACKGROUND

Plaintiff Melissa McDonald is a former employee of the Dupont Corporation who lives with multiple sclerosis ("MS") and CIDP.[1] (D.I. 22 at 3). She received benefits under the Corteva Agriscience, LLC Long Term Disability Plan ("the Plan") from April of 2018 to April of 2022. (D.I. 24 at 1). In April of 2022, the claims administrator for the Plan, The Hartford Life and Accident Insurance Company ("The Hartford"), determined that Ms. McDonald was no longer eligible for long-term disability benefits and notified her of its determination. (*Id.*). Ms. McDonald appealed (*id.*), and the appeal ultimately went to IMEDECS, "an independent medical expert that evaluates appeals on behalf of the Plan" (*id.*). IMEDECS "upheld The Hartford's denial of long-term disability benefits" and notified Ms. McDonald of its determination in a letter outlining the information it considered in its review (*id.*).

Ms. McDonald filed a Complaint seeking to obtain retroactive long-term disability benefits, or, in the alternative, an order remanding her claim to The Hartford. (D.I. 1). The Complaint includes two counts: one for a "claim for benefits, enforcement and clarification of rights, prejudgment and postjudgment interest and attorneys' fees and cost pursuant to 29 U.S.C. § 1132(a)(1)(b)" and a second for "defendants['] breaches of fiduciary duty under 29 U.S.C. § 1132(a)(3)[.]" (D.I. 1 at 3, 6) (cleaned up). The parties agreed to file cross-motions for summary

---

[1] CIDP stands for "chronic inflammatory demyelinating polyradiculoneuropathy." (D.I. 24 at 5).

judgment without discovery beyond the "Complete Administrative Claim file and applicable plan documents." (D.I. 14 at 1). The parties "anticipate [that the summary judgment motions] will be dispositive of the action." (*Id.* at 3).

## II.  DISCUSSION

The parties raise two issues: first, whether IMEDECS made a final determination as to Ms. McDonald's claim without providing her with new evidence on which it relied, in violation of ERISA Section 503 and 29 C.F.R. § 2560.503-1; second, whether The Hartford, acting as the Plan's administrator, acted arbitrarily and capriciously in terminating Ms. McDonald's long-term disability benefits. On both issues, I side with the Plan.

### A. IMEDECS Did Not Rely on New Evidence in Upholding The Hartford's Termination of Ms. McDonald's Benefits.

Ms. McDonald argues in response to the Plan's motion for summary judgment that "[b]y upholding [The] Hartford's termination of Ms. McDonald's [long-term disability] benefits, [IMEDECS] made a final determination on her claim in reliance on new additional evidence that she never had the opportunity to review prior to the final determination." (D.I. 30 at 2).[2] I disagree.

ERISA Section 503 requires that employee benefit plans "provide adequate notice . . . to any participant or beneficiary whose claim for benefits under the plan has been denied" and "afford a reasonable opportunity to any [such participant] for a full and fair review. . . ." 29 U.S.C. § 1133. 29 C.F.R. § 2560.503-1(h)(4)(i)–(ii) requires "that before the plan can issue an adverse benefit

---

[2] The Plan suggests that because Ms. McDonald did not make this argument in her opening brief in support of her own summary judgment motion, she is foreclosed from making the argument in an answering brief responding to the Plan's motion for summary judgment. (D.I. 33 at 2). While parties generally forfeit arguments made for the first time in a reply brief, *see In re: Niaspan Antitrust Litigation*, 67 F.4th 118, 135 (3d Cir. 2023), the same principle does not apply here. Ms. McDonald did not have to raise the argument in both sets of briefs. She timely raised it in an answering brief, and The Plan had a chance to respond in its reply brief.

3

determination on review on a disability benefit claim, the plan administrator shall provide the claimant . . . with any new or additional evidence considered" as well as the rationale on which the plan based its determination.

I disagree with Ms. McDonald that IMEDECS ever relied on "new additional evidence" to which she was not privy. (D.I. 30 at 2). Ms. McDonald does not identify the new evidence on which IMEDECS relied and describes IMEDECS in her own summary judgment briefing as "rely[ing] solely on [a] paper review[]." (D.I. 22 at 11). For the same reason, it is inaccurate to suggest, as Ms. McDonald does, that the IMEDECS determination itself constitutes new evidence. (D.I. 30 at 3) (noting that McDonald had no "opportunity to review and respond to [the IMEDECS report]").

Ms. McDonald also alleges that the Plan does not provide "the right to review and respond to new or additional evidence." (D.I. 30 at 3). But the Plan provides that right exactly, in language closely mirroring 29 C.F.R. § 2560.503-1(h)(4)(i)–(ii). (D.I. 25 at 85 of 138).

### B. The Hartford Did Not Act Arbitrarily or Capriciously.

Ms. McDonald argues, "The Hartford's termination of Ms. McDonald's [] benefits, and [IMEDECS'] upholding of this decision, are not supported by substantial evidence." (D.I. 22 at 11). I disagree.

"[W]here an ERISA-governed benefits plan grants discretionary authority to the plan administrator to determine eligibility for benefits under the plan, a court reviewing the plan administrator's actions should apply the arbitrary and capricious standard of review." *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir. 1997) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–12 (1989)). There is no dispute that the Plan grants discretionary authority to The Hartford to determine benefits eligibility. (D.I. 22 at 3–4; D.I. 31 at 1). "An

4

administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Soubik v. Dir., Off. of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004)). "[C]ase-specific structural and procedural factors may [also] demonstrate that a fiduciary abused its discretion in making an adverse benefit determination. . . ." *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 276 (3d Cir. 2021) (citations omitted).

### 1. Timeline

It is helpful to begin by outlining the requirements for eligibility for benefits under the Plan, as well as the general timeline of Ms. McDonald's appeal.

To be eligible for benefits under the Plan, a beneficiary must meet the Plan's definition of "disabled." (D.I. 24 at 2–4). Under that definition, a beneficiary "must be unable to perform the duties of [her] own occupation or other appropriate work" for the first twenty-four months during which [she] would receive disability insurance benefits; for any period after the first twenty-four months, a beneficiary "must be unable to perform the duties of *any* occupation . . . for which [she is] qualified by reason of [her] training, education or experience." (D.I. 25 at 76 of 138). The parties do not dispute that because Ms. McDonald has received benefits for over twenty-four months, her claim is subject to the "any occupation" standard. (D.I. 22 at 4; D.I. 24 at 6). The Plan reviewed eligibility for benefits on a periodic basis. (D.I. 24 at 4).

Ms. McDonald began receiving disability benefits in April of 2018 for "a qualifying disability caused by Multiple Sclerosis and [CIDP]" (*id.* at 5) after The Hartford determined that

5

she was disabled from her own occupation as a Senior Contract Administrator (D.I. 26 at 159–161 of 280).

In April of 2020, Leanne Wolfinger, a Vocational Case Manager working for The Hartford, determined that Ms. McDonald was unable to perform the duties of any occupation, based in part on her "concurre[nce] with Caitlin Pileggi, [Ms. McDonald's Certified Registered Nurse Practitioner], that [Ms. McDonald] would be best suited for a work from home position which would allow flexibility in pacing work tasks/activities while needing to utilize/have immediate accessibility to bathroom facilities." (D.I. 28 at 3 of 356). Wolfinger noted that Ms. McDonald was "limited to working from home given the severity of her diagnosis and low immune system due to the disability." (*Id.*). Ms. McDonald's immune system was compromised, at least in part, by her MS medication. (D.I. 22 at 6; D.I. 25 at 34 of 138). Wolfinger concluded, "No further improvement in physical functional capacity is expected based on the progressive disease/diagnosis." (D.I. 28 at 3 of 356).

On January 25, 2021, an Administrative Law Judge rendered a "[f]ully [f]avorable" decision entitling Ms. McDonald to Social Security Disability Insurance. (*Id.* at 147 of 356). The Administrative Law Judge supported the decision by finding that Ms. McDonald was "unable to perform any past relevant work" and that her "job skills [did] not transfer to other occupations within [her] residual functional capacity. . . ." (*Id.* at 151, 152 of 356).

Ms. McDonald continued to receive benefits under the Plan until April 26, 2022, when "The Hartford notified [Ms. McDonald] of its determination that she no longer met the Plan's definition of disability. . . ." (D.I. 24 at 6) (citing D.I. 27 at 347 of 890). The letter in which The Hartford notified Ms. McDonald of the disability termination listed six pieces of evidence upon which it relied for its determination:

> (1) an Attending Physician's Statement ["APS"] signed by Ms. McDonald's physicians, Dr. Dina Jacobs/Caitlin Pileggi, Certified Registered Nurse Practitioner, and dated September 14, 2021; (2) a telephone call with Plaintiff on November 2, 2021, during which she indicated that she was not treating with any medical providers other than Dr. Jacobs and Nurse Pileggi; (3) a telephone call with Plaintiff on January 27, 2022, during which Plaintiff indicated she was considering a return to work in a part-time capacity; (4) Plaintiff's medical records furnished by Dr. Jacobs and Nurse Pileggi through August 23, 2021; (5) a Transferrable Skills Analysis completed by The Hartford; and (6) a Labor Market Survey.

*Id.* (cleaned up and clarified).

In May of 2022, Ms. McDonald suffered a leg fracture. (D.I. 22 at 6–7) (citing D.I. 25 at 47 of 138). "Ms. McDonald's claim for disability [is] not based on the severe leg fracture she experienced." (*Id.* at 13). I therefore do not consider whether her leg fracture might serve as an alternative basis for short- or long-term benefits. I do, however, consider it as one fact informing the record in this case.

On September 6, 2022, Ms. McDonald, through counsel, notified The Hartford of her appeal. (D.I. 24 at 7) (citing D.I. 25 at 31 of 138).

On October 5, 2022, The Hartford provided Ms. McDonald with two "Peer Review" documents—one prepared by Dr. David B. Hoenig, a board-certified specialist in neurology with subspecialties in pain medicine and brain injury medicine, and another prepared by Dr. Henry W. Deleeuw, a board-certified specialist in orthopedic surgery. (D.I. 27 at 360–77 of 890). Dr. Hoenig's peer review determined,

> Based on the documentation provided and from a neurological perspective only, there is no specific neurological condition/diagnosis that would lead to functional impairment as of April 27, 2022 to the present and beyond.
> . . .
> There are MRI findings characteristic of multiple sclerosis. However, there is no documentation of clear neurological deficits on examination specifically related to multiple sclerosis. As such, neurologically-based impairment is not supported. There may be musculoskeletal aspects of impairment. However, this is beyond the scope of a neurological perspective.

(*Id.* at 365 of 890). Dr. Deleeuw's peer review determined that because of the leg fracture Ms. McDonald sustained in May of 2022, she "would be considered off work" from May 2, 2022 to August 2, 2022, but would be able to "work in a full time sustained capacity" from August 3, 2022 until at least January 2, 2023. (*Id.* at 375 of 890).

On November 4, 2022, Ms. McDonald provided The Hartford with a response to Dr. Hoenig's peer review: a letter from Dr. Jacobs, which, among other things, stated, "In my professional experience, Ms. McDonald is unable to work permanently due to cognitive impairment, motor and generalized fatigue, and gait and balance issues resulting in frequent falls and injuries." (D.I. 28 at 336 of 356).

On December 21, 2022, an organization called Mobile FCE Consultants provided Dr. Jacobs with a Functional Capacity Evaluation ("FCE") following an examination with Ms. McDonald. (*Id.* at 337–45 of 356). The Certified Functional Capacity Evaluator who provided the FCE to Dr. Jacobs summarized its findings as follows:

> Ms. McDonald's maximum workday tolerance level is 6 hours. . . . [S]he is unable to work an 8 hour workday while only having the ability to perform many activities on an occasional basis, which also disqualifies her for sedentary work. She is most notably unable to perform repetitive tasks involving her arms and hands, and perform prolonged standing and walking due [to] frequently reported and demonstrated pain along with difficulty maintaining her balance.

(*Id.* at 338 of 356).

On November 18, 2022, Dr. Hoenig filed an addendum report responding to Dr. Jacobs' November 4, 2022 letter. (*Id.* at 29–31 of 356). The addendum report essentially repeated Dr. Hoenig's conclusion from his peer review, alongside the conclusion that Dr. Jacobs' letter did not change his opinion. (*Id.*).

On January 10, 2023, Dr. Deleeuw filed an addendum report responding to the FCE. (*Id.* at 24–26 of 356). In view of the FCE's conclusion that Ms. McDonald "was able to lift up to 21

8

pounds, push, and pull, up to 69.5 pounds," as well as his assessment that Ms. McDonald had "self-limit[ed]" during the FCE (in other words, not tried as hard as she could have), Dr. Deleeuw concluded that the "FCE, in [his] opinion, [did] not appear to be reasonable." (*Id.* at 25 of 356).

On February 2, 2023, The Hartford notified Ms. McDonald that her appeal was denied. (D.I. 25 at 93 of 138). The notification credited Dr. Hoenig and Dr. Deleeuw's determinations and noted that Dr. Deleeuw's determination with respect to Ms. McDonald's leg injury could not serve as the basis for the appeal because that injury occurred after The Plan terminated Ms. McDonald's benefits. (*Id.* at 94 of 138).

On March 22, 2023, Ms. McDonald notified The Hartford that she was escalating her appeal to the final level. (*Id.* at 106 of 138).

The Hartford forwarded Ms. McDonald's final appeal to IMEDECS, "an independent medical expert that evaluates appeals on behalf of the Plan." (D.I. 24 at 1). IMEDECS received the case assignment on April 5, 2023. (*Id.* at 8).

On May 15, 2023, IMEDECS notified Ms. McDonald that it would "uphold the health plan's denial." (D.I. 27 at 102 of 890). IMEDECS reached its conclusion after "analyz[ing] the documentation provided by Ms. McDonald's physicians and all of the correspondence between and among Ms. McDonald, her representatives and physicians, and The Hartford." (D.I. 24 at 13). IMEDECS' letter to Ms. McDonald "explained that none of Ms. McDonald's medical providers found evidence of continuing major cognitive deficits or motor deficits" (*id.*), and that Ms. McDonald's "[d]exterity and coordination are frequently documented as normal during multiple neurological evaluations" (D.I. 27 at 107 of 890).

2. **Substantial Evidence Supports The Hartford's Determination.**

An administrator's decision can be arbitrary and capricious "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher*, 679 F.3d at 121. Ms. McDonald not does argue that The Hartford's termination of Ms. McDonald's benefits was without reason or erroneous as a matter of law. (D.I. 22 at 11) ("[The] Hartford's termination of Ms. McDonald's [long-term disability] benefits, and [IMEDECS'] upholding of this decision, are not supported by substantial evidence."). "[C]ase-specific structural and procedural factors . . . [can also] demonstrate that [the] fiduciary abused its discretion in making an adverse benefit determination," *Noga*, 19 F.4th at 276. Taking these factors into account collectively, I find that none warrant overturning the Hartford's decision to terminate Ms. McDonald's benefits.

According to IMEDECS, Ms. McDonald's recent office visits and examinations reported "normal vision, coordination, ambulation, and motor function," as well as "no major cognitive deficits [or] motor deficits, indicating full strength and normal coordination. . . ." (D.I. 27 at 107 of 890). IMEDECS concluded that the documentation available did "not provide consistent, objective evidence of substantial and continuous neurological deficits that would establish any substantial restrictions or limitations." (*Id.*). That conclusion would seemingly be consistent with the 2021 APS from Dr. Jacobs and CRNP Pileggi, which asserted that Ms. McDonald "[did] not have a psychiatric/cognitive impairment" and that she could sit for five hours a day and stand for two to three hours per day, as well as occasionally bend, crouch, and the like. (*Id.* at 347 of 890). IMEDECS' conclusion is also supported by the results of an August 4, 2022 visit with CRNP Pileggi in which Ms. McDonald exhibited normal "mentation [*i.e.*, mental activity] and speech," normal "[m]otor examination," and normal coordination. (*Id.* at 364 of 890). There is no indication that IMEDECS was unaware of or otherwise ignored any aspect of the record; indeed, the letter includes a voluminous "List of Materials Received" and explains why it does not credit

Ms. McDonald's FCE. (*Id.* at 107 of 890). Because IMEDECS considered the entire record and reached a conclusion the evidence would seem to fairly support, IMEDECS' determination is supported by substantial evidence.

Ms. McDonald raises several arguments in response.

### a. The Hartford's Previous Determination

First, Ms. McDonald argues that the "Hartford had previously determined that Ms. McDonald was disabled from 'Any Occupation' and her condition had not changed" by April 26, 2022. (D.I. 22 at 1). This argument primarily relies on *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 848–49 (3d Cir. 2011), in which the Third Circuit considered whether new medical records furnished by a plan beneficiary to his plan pursuant to "periodic[] request[s for] medical updates from Miller to document his disability" constituted new information supporting a change in the plan's decision to terminate benefits it had previously granted. The Third Circuit concluded that the new medical records did not constitute new information, because "[t]he records . . . [did] not differ in any material aspect from the records submitted [previously] that [the plan] determined supported a disability finding." *Id.* at 848. The court held, "[I]n the absence of any meaningful evidence to support a change in position, [an] abrupt reversal [with respect to an eligibility determination] is cause for concern that weighs in favor of finding that [a] termination decision was arbitrary and capricious." *Id.* at 849.

I am not persuaded that *Miller* applies here. In 2020, Ms. Wolfinger, The Hartford's Vocational Case Manager concluded that Ms. McDonald was capable of "full time Sedentary work" but that she was nevertheless disabled from "any" occupation because her immunocompromised status precluded working away from home. (D.I. 28 at 3 of 356). By 2022, however, the evidence of Ms. McDonald's ability to work in-person was more mixed. The

11

Hartford noted, "There [were] no [work from home] restrictions documented on the 9/14/2021 [APS]" (D.I. 27 at 86 of 890) and that Ms. McDonald had recently indicated she was considering returning to work in a part-time capacity (*id.*). That is substantial evidence from which to conclude that Ms. McDonald's immunocompromised status had improved; accordingly, in 2022, the Hartford identified at least three positions within fifty miles for which Ms. McDonald would be qualified. (*Id.* at 84 of 890). The information available to The Hartford in 2022 therefore "differ[ed] in [a] material aspect from the records submitted [previously] that [the plan] determined supported a disability finding." *Miller*, 632 F.3d at 848.

### b. Reliance on Non-Treating Physicians' Reports

Second, Ms. McDonald argues that it was unreasonable for The Hartford to rely on the conclusions of its experts, who conducted paper reviews and were not specialists in MS, over the conclusions of Ms. McDonald's treating physicians. (D.I. 22 at 11).

With respect to crediting one set of experts over another: "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). On the other hand, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* In short, a plan administrator is "permitted to rely on the opinions of its medical consultants." *Daly v. Metro. Life Ins. Co.*, 2018 WL 4700224, at *8 (D. Del. Sept. 30, 2018). The fact that IMEDECS reached a different conclusion from those of Ms. McDonald's treating physicians does not, on its own, render its conclusion arbitrary and capricious.

With respect to paper reviews: Ms. McDonald is correct to assert that a plan administrator's decision to conduct a paper review rather than credit the plan beneficiary's treating physicians is a factor weighing against the plan administrator. Indeed, "[c]ourts have expressed concern where an administrator denies a claim in reliance on reports from paper-review consultants that contradict the treating and examining physicians' consistent and concurring opinions that the claimant is disabled." *Levine v. Life Ins. Co. of N. Am.*, 182 F. Supp. 3d 250, 263 (E.D. Pa. 2016) (citing cases). Ms. McDonald is incorrect, however, to assert that reliance on paper reviews renders a plan administrator's determination unreasonable *per se*. "Instead, 'a decision to . . . conduct only a paper review, while not rendering a denial of benefits arbitrary *per se,* is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process.'" *Potts v. Hartford Life & Accident Ins. Co.*, 272 F. Supp. 3d 690, 710 (W.D. Pa. 2017) (quoting *Killian v. Hartford Life & Accident Ins. Co.*, 2017 WL 429905, at *14 (E.D. Pa. Jan. 31, 2017)).

With respect to specialization: While I note that Dr. Jacobs is a specialist in MS, I also note that Dr. Hoenig is a board-certified specialist in neurology with subspecialties in pain medicine and brain injury medicine. (D.I. 27 at 360–77 of 890). The unnamed[3] IMEDECS doctor a/k/a S281 is "board certified in neurology," "[m]aintains a private practice treating patients in general neurology and with movement disorders," is "widely published in peer reviewed literature," and

---

[3] Ms. McDonald suggests that it was error for The Hartford not to reveal IMEDECS' identity. (D.I. 30 at 3) ("Upholding [The] Hartford's termination of Ms. McDonald's benefits without her even being aware of the party making the decision . . . is a major tear in Defendant's façade of procedural adherence."). The Plan responds that under Department of Labor regulations, "such a disclosure is not required unless the claimant specifically requests the name of such experts during the claims and appeals process[.]" (D.I. 33 at 4–5) (citation omitted). The Plan is correct. *See, e.g., Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 161–62 (E.D.N.Y. 2019).

13

"[p]reviously served as director of Parkinson's Disease and Deep Brain Stimulation Centers at university affiliated medical centers." (*Id.* at 106 of 890). Given that The Hartford's experts explained their reasoning and have ample expertise from which to draw their conclusions, I do not consider their lack of specialization in MS specifically as *per se* evidence of arbitrary and capricious conduct from The Hartford, though I do consider it as one factor in my overall assessment.

In the same vein, Ms. McDonald argues that the reports of Dr. Hoenig, Dr. Deleeuw, and IMEDECS are without merit. (D.I. 22 at 11–17). I note that my review is limited to the final level of appeal, *i.e.*, the IMEDECS decision, and that it is therefore unnecessary to discuss Dr. Hoenig's and Dr. Deleeuw's reports. "[I]t is the final decision . . . that is at issue." *Krensavage v. Bayer Corp.*, 314 F. App'x 421, 425 (3d Cir. 2008) (citing *Hanna v. Delta Family-Care Disability and Survivorship Plan*, 2006 WL 1885181, at *1 n. 2 (M.D. Fla. July 7, 2006)). Nevertheless, to explain why the IMEDECS decision is well supported, I discuss below why I disagree with Ms. McDonald's characterization of Dr. Hoenig's and Dr. Deleeuw's reports before continuing to IMEDECS.

Ms. McDonald asserts that Dr. Hoenig's report was "[m]eritless" because it concluded that "Ms. McDonald's neurological examinations with CRNP Pileggi were [] normal." (D.I. 22 at 15). Rather than challenging Dr. Hoenig's conclusion that the results of the neurological examinations were normal, Ms. McDonald argues simply that "MS in particular is known to cause several functional impairments. . . ." (*Id.*). But Dr. Hoenig never disputed that Ms. McDonald suffered from MS, and Ms. McDonald offers no reason Dr. Hoenig was required to credit some evidence, such as "Ms. McDonald's physical issues, [including] her falls" (*id.*), over other evidence, such as neurological evaluations.

14

Ms. McDonald also argues that Dr. Hoenig's report was flawed because it insisted on objective evidence of subjective conditions such as fatigue and cognitive slowing. (*Id.*). Ms. McDonald is correct that insisting on objective evidence of a symptom for which there are no objective tests can be arbitrary and capricious. *See Fisher v. Aetna Life Ins. Co.*, 890 F. Supp. 2d 473, 483 (D. Del. 2012). Dr. Hoenig's report, however, focused not on the need for evidence of fatigue or cognitive slowing, but on the lack of "documentation of clear neurological deficits. . . ." (D.I. 27 at 367 of 890). Rather than suggesting that Dr. Hoenig insisted on objective evidence for subjective symptoms, the record suggests that Dr. Hoenig made a determination as to Ms. McDonald's disability in light of the record before him. In any event, Dr. Hoenig noted that while Ms. McDonald was "receiving treatment for multiple sclerosis, [] there [was] no specific treatment for fatigue" (*id.*), and that "[t]here [was] no documentation of impairing fatigue" (*id.*), objective or not. I do not read either of these statements as suggesting that Ms. McDonald was required to provide objective evidence of her fatigue.

Ms. McDonald notes that Dr. Hoenig did not discuss the FCE. (D.I. 22 at 16). As discussed below, Dr. Deleeuw did discuss the FCE, and IMEDECS had access to the reports of both Dr. Deleeuw and Dr. Hoenig.

Finally, Ms. McDonald criticizes Dr. Hoenig's purported failure to "adequately address[] Dr. Jacobs' [November 4, 2022] letter." (*Id.* at 12). In fact, Dr. Hoenig did respond to Dr. Jacobs' letter, if only to say that it did not change his opinion that the record lacked any "documentation of clear neurological deficits. . . ." (D.I. 28 at 30 of 356). Because Dr. Jacobs' letter did not present any new medical evidence, and instead explained her view as to why the existing medical evidence supported Ms. McDonald's claim (*id.* at 334–36 of 356), Dr. Hoenig's response—reiterating his

15

initial conclusions given the lack of support for Ms. McDonald's claim in the record—is reasonable.

Ms. McDonald also critiques Dr. Deleeuw's report. (D.I. 22 at 14–16). The most relevant consideration with respect to Dr. Deleeuw is his report addendum, which found the FCE's conclusion regarding Ms. McDonald's inability to work to be "unreasonable" as Ms. McDonald "was able to lift up to 21 pounds, push, and pull, up to 69.5 pounds. . . ." (D.I. 28 at 25 of 356). Dr. Deleeuw also concluded that Ms. McDonald "self-limit[ed]" during the FCE, perhaps because she only "[c]ompleted 10 of 36 tasks." (*Id.*). As Ms. McDonald correctly points out, this seems to be a clear misreading of the FCE, which stated not that Ms. McDonald only completed ten of thirty-six tasks, but that she only completed ten of thirty-six stair repetitions. (D.I. 28 at 343 of 356). Nevertheless, considering the other findings in the FCE, Dr. Deleeuw's determination that its ultimate conclusion was unreasonable has a basis in the record.

That leaves the IMEDECS report. As I noted above, IMEDECS' opinion is well-reasoned and finds substantial evidence in the record. Ms. McDonald's critiques of IMEDECS' opinion— that it failed to give enough credence to other aspects of Ms. McDonald's neurological exams, or that its interpretation of the FCE is unreasonable (D.I. 22 at 17)—are invitations for me to "substitute [my] own judgment for that of the defendants in determining eligibility for plan benefits." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009). I decline to do so.

### c. Social Security Disability Insurance Findings

Third, Ms. McDonald notes, "Ms. McDonald was approved for Social Security Disability Insurance ("SSDI") benefits effective on January 2021," which Ms. McDonald argues is "probative evidence" that Ms. McDonald was disabled under the Plan. (D.I. 22 at 9–10). "It is

16

well established, however, that an award of SSD benefits does not in itself establish that [a plan administrator's] decision was arbitrary and capricious." *Balas v. PNC Fin. Servs. Grp., Inc.*, 2012 WL 681711, at *11 (W.D. Pa. Feb. 29, 2012) (citing *Connor v. Sedgwick Claims Mgmt. Servs.*, 796 F. Supp. 2d 568, 584–85 (D.N.J. 2011)). Here, The Hartford's denial letter acknowledged that Ms. McDonald was approved for SSDI and explained in detail why "[i]t is possible to qualify for SSDI, but no longer continue to qualify for private long-term disability [] benefits. . . ." (D.I. 27 at 478 of 890). It then lists three reasons, two of which are relevant: first, "Social Security guidelines treat advancing age [] as an increasingly limiting factor in a worker's ability to adjust to other work," whereas The Hartford does not; second, "[t]he SSA does not conduct an analysis of skills that may be transferrable to other occupations," whereas The Hartford does. (*Id.*). These differences are substantial enough that a reasonable mind could still conclude that Ms. McDonald satisfied the Plan's definition of "disabled."

In light of the foregoing, I conclude that The Hartford's denial of Ms. McDonald's claim was not arbitrary or capricious.

### III. CONCLUSION

An appropriate order will issue.